**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA TOW TRUCK
ASSOCIATION,

*Plaintiff-Appellant*,

v.

CITY AND COUNTY OF SAN
FRANCISCO,

*Defendant-Appellee.*

No. 13-15614

D.C. No.
3:10-cv-03184-
CRB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, Senior District Judge, Presiding

Argued and Submitted
February 11, 2015—San Francisco California

Filed August 13, 2015
Amended December 8, 2015

Before: Michael Daly Hawkins, Richard A. Paez,
and Marsha S. Berzon, Circuit Judges.

Order;
Opinion by Judge Berzon

# SUMMARY[*]

## Federal Aviation Administration Authorization Act / Preemption

The panel filed (1) an order denying petitions for panel rehearing and rehearing en banc and (2) an amended opinion affirming in part and reversing in part the district court's summary judgment in an action challenging San Francisco ordinances that comprehensively regulate the towing industry within the city and provide a number of conditions and requirements concerning towing permits.

Tow car firms are "motor carriers" under the Federal Aviation Administration Authorization Act, and the San Francisco ordinances, known as the "Permit Scheme," generally relate to a price, route, or service of a motor carrier. The panel held, therefore, that Permit Scheme provisions were preempted by the FAAAA unless they fell within the FAAAA's savings clauses, which included a "safety exception."

Agreeing with the Second Circuit, the panel held that the safety exception covered regulations related both to the safe physical operation of the tow trucks themselves and to the safety of other vehicles and individuals involved in the towing process. The panel held that Permit Scheme's permit requirements fell within the safety exception, as did multiple other Permit Scheme provisions, including permit application requirements, permit fee and penalty provisions, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

recordkeeping and brochure requirements. The panel also held that possession and display requirements were not subject to preemption. Finally, the panel held that the Permit Scheme's complaint system requirement fell within the safety exception, but its business plan requirement did not and therefore was preempted. The panel remanded the case to the district court for further proceedings.

## COUNSEL

Patrick J. Whalen, The Law Offices of Brooks Ellison, Sacramento, California, for Plaintiff-Appellant.

Wayne Snodgrass (argued), Deputy City Attorney; Dennis J. Herrera, City Attorney; Vince Chhabria, Deputy City Attorney, San Francisco, California, for Defendant-Appellee.

## ORDER

The panel has voted to deny appellant's petition for panel rehearing and petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The panel has voted to amend the opinion. The amended opinion is attached hereto.

The petition for panel rehearing and petition for rehearing en banc are **denied**. No further petitions for rehearing will be permitted.

**OPINION**

BERZON, Circuit Judge:

The City and County of San Francisco requires tow truck drivers and towing firms to obtain permits to operate and conduct business within San Francisco. The City enacted two ordinances, Articles 30 and 30.1 of the San Francisco Police Code (the "Permit Scheme"), which comprehensively regulate the towing industry within the city and provide a number of conditions and requirements concerning the towing permits.

The California Tow Truck Association ("CTTA") challenged the Permit Scheme, contending that it is preempted by the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501 ("FAAAA" or the "Act"). After the district court initially granted partial summary judgment, the parties appealed to this court. *See Cal. Tow Truck Ass'n v. City & Cnty. of S.F.*, 693 F.3d 847 (9th Cir. 2012) ("*CTTA I*"). We held that the district court did not analyze the Permit Scheme as required by our precedent, and so vacated the judgment and remanded for the required provision-by-provision analysis. *See id.* at 866.

Following remand, the district court upheld nearly all of the Permit Scheme, holding some provisions outside the ambit of the Act's express preemption clause, 49 U.S.C. § 14501(c)(1), and others covered by the Act's savings clauses, *id.* § 14501(c)(2)(A)–(C). In particular, the district court determined that many of the provisions fell within the FAAAA's "safety exception," *id.* § 14501(c)(2)(A), because they are "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S.

424, 442 (2002). The district court thus granted the City's cross-motion for summary judgment, from which CTTA appeals. With the exception of the challenge to the Permit Scheme's business plan requirement, we affirm.

I.

A.

Pursuant to its authority under California law, *see* Cal. Veh. Code § 21100(g)(1), the City enacted the Permit Scheme. Article 30 of the Permit Scheme regulates "tow car drivers," S.F. Police Code § 3000 *et. seq.*, and Article 30.1 regulates "tow car firms," *id.* § 3050 *et seq.*[1] "Together, Articles 30 and 30.1 set forth a comprehensive regulatory regime requiring tow truck drivers and towing firms to obtain permits to operate and conduct business in San Francisco." *CTTA I*, 693 F.3d at 851.

Article 30 provides that "[n]o person shall drive or operate a tow car within the City . . . without first obtaining a permit from the Chief of Police . . . ." S.F. Police Code § 3000. To obtain a permit, tow car drivers must submit

---

[1] The Permit Scheme adopts the California Vehicle Code's definition of tow car: "[A] motor vehicle which has been altered or designed and equipped for, and primarily used in the business of, transporting vehicles by means of a crane, hoist, tow bar, tow line, or dolly or is otherwise primarily used to render assistance to other vehicles." Cal. Veh. Code § 615(a); *see* S.F. Police Code § 3001.

A "tow car firm" is defined as "[a]ny person, firm, partnership, association, corporation, or any other group . . . engaged in the business of transporting, removing, or storage of motor vehicles, including the owner/operator of any tow car as herein defined." *Id.* § 3051.

identifying information, and disclose any criminal arrest history. *See id.* § 3002. Along with the application, applicants must submit fingerprints, passport-size photographs, a letter from an employer, and a filing fee. *Id.* § 3003. After receiving an application for a permit, "[t]he Chief of Police shall . . . make an investigation without unnecessary delay . . . and grant such application," unless the applicant was convicted of violating, or acted in violation of, certain enumerated criminal statutes, or falsified information on the application. *Id.* § 3004.

The tow car driver must keep the permit, which contains the names and residences of the driver and employer and other identifying information, in "his immediate possession at all times while driving or operating a tow car and shall exhibit such permit on demand of any peace officer." *Id.* §§ 3006, 3007. The permits last for one year, are renewable upon payment of the annual license fee, *id.* § 3008, and can be revoked after a hearing if the Chief of Police "finds that grounds exist which would have constituted just cause for refusal to issue such permit," *id.* § 3011. Driving or operating a tow car within the City without a permit, or not maintaining possession of a permit while driving or operating a tow car, is a misdemeanor. *Id.* § 3012.

The Permit Scheme's requirements for tow car firms are similar to those for tow car drivers. As with tow car drivers, "[n]o person shall engage in or conduct business as a tow car firm within the City . . . without first obtaining a permit from the Chief of Police . . . ." *Id.* § 3050. Applicants for such permits must provide not only identifying information about themselves and their business, *id.* § 3052(1)–(2), but also additional information, including: details of "every tow car that will be operated by the tow car firm," *id.* § 3052(3); "[a]

description of the applicant's business plan, and proposed services to be provided, including . . . a system for handling complaints that is acceptable to the Chief of Police," *id.* § 3052(4); the name and permit number of all tow car operators employed by the firm, *id.* § 3052(5); evidence of a minimum level of insurance, *id.* § 3052(6); and a "record of all crimes of which the applicant has been convicted, plead[ed] guilty, or plead[ed] no contest," *id.* § 3052(7). Like tow car driver applicants, tow car firm applicants must submit fingerprints, photographs, and a filing fee. *Id.* § 3053.

A tow car firm permit shall be granted unless the Police Department finds that the applicant, among other things, does not possess a minimum level of insurance, does not possess requisite tow car equipment, or has been convicted of certain crimes. *Id.* § 3054. Every firm issued a permit must display the permit "in a conspicuous place within the tow car firm business address, so that the [permit] may be readily seen by persons entering the premises." *Id.* § 3055. The Police Department may suspend or revoke a tow car firm permit for any of the grounds listed in § 3054, as well as for additional reasons, including failing to maintain required levels of insurance and employing a tow car operator who lacks a valid operating permit. *Id.* § 3056.

Like the individual tow car driver permits, a tow car firm permit lasts for a year and is renewable upon payment of an annual license fee. *Id.* § 3062. Article 30.1, however, contains some additional requirements for tow car firm permit-holders. For example, tow car firms are required regularly to submit proof of insurance and evidence of registration, and must notify the Police Department of the number of tow vehicles or changes in tow car drivers' employment status. *Id.* § 3058. Additionally, "[t]ow car firm

vehicles may be inspected for code and safety violations by any peace officer." *Id.* § 3059. Tow car firms are also required to maintain records of each vehicle towed for three years and to make such records available for inspection by any peace officer. *Id.* § 3060. Conducting business without a tow car firm permit or failing to display the permit at the tow car firm business is a misdemeanor. *Id.* § 3064.

The San Francisco Board of Supervisors amended Article 30.1 in 2009 to include a brochure requirement. *See id.* § 3055.2(c). When a vehicle has been towed, tow car firms must "provide information to towed-vehicle owners by displaying and making available a brochure 'in a conspicuous place in the location where a vehicle owner must come to reclaim their towed vehicle.'" *CTTA I*, 693 F.3d at 854 (quoting S.F. Police Code § 3055.2(c)). The brochure, developed by the City's police department, consists of "a concise summary of California law, including the maximum rate that can be legally charged for a private property tow and the rights and responsibilities of all parties who participate in towing from private property . . . ." S.F. Police Code § 3055.2(b). Non-compliance with this requirement triggers an administrative penalty of $500. *Id.* § 3055.2(f).

When it promulgated the brochure requirement in 2009, the Board of Supervisors made a number of legislative findings, including:

> (i) that there are frequent incidents of illegal towing from private property in San Francisco; and

(ii) that there is a significant risk to the safety of residents and visitors when illegal towing from private property occurs at night; and

(iii) that there is a risk to public health and safety when the vehicles of senior citizens and persons with disabilities are illegally towed from private property; and

(iv) that illegal towing from private property affects vulnerable populations when people of limited economic means are required to pay hundreds of dollars to recover their vehicle, or are subjected to deficiency claims by collection agencies if they could not afford to pick up their vehicle even though the vehicle was illegally towed; and . . .

(ix) that consistent adherence to legal towing practices will substantially increase the quality of life for residents and the experience of visitors to San Francisco.

S.F. Police Code § 3055.2(a). Both Articles 30 and 30.1 include severability clauses, providing that if any part is "held to be unconstitutional or invalid," such a decision "shall not affect the validity or effectiveness of the remaining portions." *Id.* §§ 3013, 3065.

B.

In July 2010, CTTA, a nonprofit organization representing more than 1,000 towing companies doing business in California, filed a complaint against the City in

San Francisco Superior Court. According to CTTA, its members had been "harassed and subject to citations, fines, and in some cases the impound of their tow truck . . . for failing to obtain a permit." Moreover, it alleged, "[t]he ability of CTTA members to conduct their business is adversely affected by the San Francisco ordinance, because it subjects them to great uncertainty as to whether they are able to conduct business in, around, and through the City." Several owners and operators of tow car firms also declared that the Permit Scheme has impacted their routes and services, and caused them to incur significant costs.

In its action, CTTA sought, among other things, a declaration that the Permit Scheme is preempted by federal law and an injunction prohibiting the City from enforcing its provisions. After the City removed the case to federal court, the parties filed cross-motions for summary judgment. As relevant here, CTTA argued that the Permit Scheme is preempted by the FAAAA's express preemption clause, which provides: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

Conceding that the Permit Scheme "relate[s] to" the "price" and "service" of a towing company, and hence of a "motor carrier," the City argued that the Permit Scheme is not preempted because it falls within the Act's savings clauses — in particular, the Act's "safety exception." The safety exception provides that the Act's express preemption clause "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A). The City emphasized that the regulations were motivated by

safety concerns, pointing in particular to a declaration by Sergeant William Coggan, the Commanding Officer of the San Francisco Police Department's Permit Section. Coggan explained that "corruption and criminal activity pervade the [towing] industry," leading to "[i]mproper conduct" such as "towing vehicles illegally; overcharging people whose vehicles are towed; outright stealing towed vehicles; operating tow trucks in an unsafe manner on the road; stealing merchandise from towed vehicles; and causing damages to towed vehicles." Further, Coggan stated that he was "aware of instances in which tow operators or their employees have physically or sexually assaulted persons whose cars had been towed." "[T]he towing business," Coggan declared, "by its nature, presents certain dangers to the public," as "when a person discovers that her car has been towed, she is sometimes left stranded in a dangerous location."

The district court initially held that the Permit Scheme was preempted to the extent it applied to companies and drivers that engage solely in "consensual" tows, as well as to those merely "passing through" San Francisco. *CTTA I*, 693 F.3d at 856–57.[2] But it also held that the Permit Scheme was not preempted as applied to companies and drivers that engage in "nonconsensual tows" in the City. *Id.* The district

---

[2] Consensual towing involves "an agreement between the car owner and the tow truck driver," while "[n]on-consensual towing involves towing, often from private lots, improperly or 'illegally' parked cars." *CTTA I*, 693 F.3d at 857. "In non-consensual tows the car owner typically does not know that his car has been towed until he comes to retrieve it and it is not there." *Id.*

court entered judgment for the City on CTTA's other federal claims, and remanded CTTA's state claims to state court.[3]

Both parties appealed on the FAAAA preemption question. We concluded that the district court erred in analyzing the Permit Scheme "without specifically addressing its individual provisions," rather than "on a provision-by-provision basis." *CTTA I*, 693 F.3d at 850, 860. The district court, we noted, need not "analyze every sentence of the Permit Scheme, line by line." *Id.* at 863. But "where a multi-faceted law or regulation is challenged as a whole," we explained, "it is still necessary to analyze each of its essential or major component parts." *Id.* at 860. Although the district court applied the correct test in determining whether the Permit Scheme was preempted, *id.* at 861–62, it did not "analyze the major provisions identified . . . and address whether the Permit System can survive, after severing provisions, if any, that are pre-empted," *id.* at 863. We thus vacated and remanded to the district court to conduct the FAAAA preemption analysis "in the first instance." *Id.*[4]

---

[3] After the San Francisco Superior Court granted judgment for the City on its state preemption claims, CTTA appealed. The Court of Appeal reversed, noting that, under California law, a local authority may "only license and regulate tow truck services and drivers having their 'principal place of business or employment' within the jurisdiction of the local authority." *Cal. Tow Truck Ass'n v. City & Cnty. of S.F.*, 225 Cal. App. 4th 846, 858 (2014). It thus held the City's regulation of towing services and drivers whose "principal place of business or employment is located in another jurisdiction" preempted by state law. *Id.*

[4] *CTTA I* also held that, as the "undisputed evidence" established that the City does not require tow truck drivers and tow firms to obtain a permit just to pass through, CTTA could not show "a realistic danger of enforcement," and thus lacked standing. 693 F.3d at 865–66. As a result, the district court lacked jurisdiction to enjoin the City from enforcing the

After remand, the parties again filed cross-motions for summary judgment. The district court then granted summary judgment to the City as to all but one of the challenged provisions of the Permit Scheme, holding that a majority of the Permit Scheme's provisions were exempted from preemption by the Act's safety, insurance, and price exceptions.[5] In so holding, it rejected CTTA's "narrow" definition of "motor vehicle safety," noting that "the Ninth Circuit has endorsed a concept of motor vehicle safety that encompasses but surely goes well beyond the safe performance of towing services." The district court also determined that several challenged provisions — the permit display requirement (sections 3007 and 3055) and the business plan requirement (section 3052(4)) — were not subject to the FAAAA's express preemption clause at all. CTTA appeals from that judgment.

II.

A.

"The principal purpose of the FAAAA was 'to prevent States from undermining federal deregulation of interstate trucking' through a 'patchwork' of state regulations." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 644 (9th Cir. 2014) (quoting *Am. Trucking Ass'ns v. City of L.A.*, 660 F.3d 384,

---

Permit Scheme against "tow trucks merely passing through San Francisco." *Id.*

[5] The district court concluded that section 3056(2), which authorizes the Chief of Police to revoke the permit of any tow firm that imposes charges "in excess of the maximum rate established by the [City] for its contracted tow car firms," was preempted. The City does not appeal this holding.

395–96 (9th Cir. 2011), *rev'd in part*, 133 S.Ct. 2096 (2013)). Toward that end, the FAAAA contains an express preemption clause, which provides:

> Except as provided in [the savings clauses in] paragraphs (2) and (3), a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . .

49 U.S.C. § 14501(c)(1). The parties agree that tow car firms are "motor carriers" under the statute, and that the Permit Scheme generally "relate[s] to a price, route, or service" of a motor carrier. *See CTTA I*, 693 F.3d at 857. Accordingly, at least some of the Permit Scheme's provisions are preempted unless they fall within the FAAAA's savings clauses, 49 U.S.C. § 14501(c)(2)–(3).

Three of those clauses are at issue here. *See CTTA I*, 693 F.3d at 857–58. The "safety exception" provides that the FAAAA "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A). The "insurance exception" saves from preemption state laws "relating to insurance requirements and self-insurance authorization." *Id.* Finally, the "price exception" permits "a State or a political subdivision of a State to enact or enforce a law . . . relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle" — i.e., is a nonconsensual tow. *Id.* § 14501(c)(2)(C). As the district court observed, "[t]he motor vehicle safety exception

is the main, though not exclusive, focus of the parties' dispute."

Importantly, "[p]reemption analysis 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Ours Garage*, 536 U.S. at 438 (second alteration in original) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Furthermore, the Act "does not pre-empt state laws that affect rates, routes, or services in too tenuous, remote, or peripheral a manner." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008) (internal quotation marks omitted).

## B.

*Ours Garage* held that the FAAAA's safety exception can apply to ordinances enacted by municipalities, even though § 14501(c)(2)(A) refers only to "the safety regulatory authority of a State." 536 U.S. at 428. That is so, *Ours Garage* explained, because "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property . . . 'not restrict' the preexisting and traditional state police power over safety[,] . . . includ[ing] the choice to delegate the State's 'safety regulatory authority' to localities." *Id.* at 439. "At the same time, however, *Ours Garage* also warned that states and municipalities could not hide economic regulation under the guise of safety regulation." *CTTA I*, 693 F.3d at 858 (internal citation and quotation marks omitted).

*Ours Garage* went on to direct a basic framework for applying the FAAAA's safety exception: A state law is saved from preemption only if it is "genuinely responsive to safety

concerns." 536 U.S. at 442. We have given that approach shape by fashioning "a two-part inquiry":

> The first step examines any "expressions of legislative intent," including (1) the particular language of the statute or regulation being challenged, and any explicit statutory or regulatory findings in the provision; and (2) available legislative or regulatory history. . . . Once a safety motivation is identified, the second step looks to "the existing record evidence" to determine whether there is a "logical" or "genuine" connection between the regulation and the safety justification, or, instead, whether the purported safety justification is a pretext for undue economic regulation. The more attenuated or speculative the connection, the more likely it will be that a court will find the purported safety motives "illusory or pretextual" and that the safety justification will not withstand scrutiny.

*CTTA I*, 693 F.3d at 860.

*CTTA I* also articulated some more specific guidelines concerning the FAAAA's safety exception "applicable to the district court's preemption analysis on remand." *Id.* at 863. First, while the initial step of the safety-exception test "addresses whatever traditional sources of legislative intent are available," it "also allows for the situation where history is lacking — especially at a local level where committee reports or municipal statements might not be published." *Id.* at 864. "[M]erely because a safety rationale is not

documented does not necessarily mean the safety exception cannot apply," *CTTA I* explained, as "[s]ometimes a safety justification is so obvious that it need not be stated — intent can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances." *Id.* (citing *Tillison v. Gregoire*, 424 F.3d 1093, 1102–03 (9th Cir. 2005)).

Next, *CTTA I* described how to assess legislative intent when regulators had "mixed motives" — for example, where a regulation was motivated by safety concerns *and* economic concerns. We observed that "'[t]he presence of such mixed motives . . . does not preclude the application of the safety exception, provided that the State's safety motives are not pre-textual.'" *Id.* at 860 (alteration in original) (quoting *Am. Trucking*, 660 F.3d at 405). Determining whether an asserted safety motive is not pretextual "is equivalent to asking whether a law is 'genuinely responsive' to safety concerns" — in other words, whether the challenged provision has a "logical connection" to motor vehicle safety. *CTTA I*, 693 F.3d at 860.

Finally, we reiterated in *CTTA I* that proper analysis of an FAAAA preemption challenge to a comprehensive regulation must be conducted on a "provision-by-provision basis." *Id.* "'Were it otherwise, a single valid excepted provision would allow a vast amount of nonexcepted provisions to stand.'" *Id.* (quoting *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1055 (9th Cir. 2009)). "Similarly, the mere fact that one part of the regulatory scheme is preempted does not mean that other parts of the scheme are preempted, or that the scheme as a whole is preempted." *Id.*

III.

Before applying the above principles to San Francisco's Permit Scheme, we consider a threshold dispute between the parties over the proper scope of the FAAAA's safety exception.

CTTA argues that an appropriately circumscribed understanding of the Act's safety exception covers only regulations related to the "motor vehicle safety" of the tow trucks themselves — for example, "the manner in which tow trucks operate, the way they are driven on the roadways, and the manner in which they transport motor vehicles" — and not the safety of the people whose vehicles are towed. Conversely, the City contends that CTTA "assumes an artificially narrow definition of the term 'safety,'" and that, properly understood, the safety exception covers "regulation[s] seek[ing] to prevent or mitigate the danger a person experiences when her motor vehicle is being or has been towed by another motor vehicle."  The City is correct.

The very language of the safety exception demonstrates that CTTA's understanding of the FAAAA's safety concept is unduly narrow.  Section 14501(c)(2) provides that the FAAAA "shall not restrict *the safety regulatory authority* of a State *with respect to* motor vehicles."   49 U.S.C. § 14501(c)(2)(A) (emphases added).  The safety exception nowhere mentions "motor vehicle safety," the talismanic phrase to which CTTA repeatedly refers.[6]   Rather, it

---

[6] We acknowledge that courts have occasionally referred to "motor vehicle safety" when applying the safety exception.  *See, e.g.*, *Rowe*, 552 U.S. at 374; *CTTA I*, 693 F.3d at 860, 862.  But, as noted, the relevant statutory language contains no such phrase.

expressly states that the FAAAA shall not restrict the State's *general* "safety regulatory authority," not just its regulatory authority regarding the safe operation of the regulated motor vehicles.

Nor does the language of the exception limit the "motor vehicles" covered by the exemption to the regulated vehicles covered by the FAAAA as a whole.  Indeed, the FAAAA specifically defines "motor vehicle" for purposes of this part of the statute as:

> a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary, but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from a fixed overhead wire, and providing local passenger transportation similar to street-railway service.

49 U.S.C. § 13102(16).  "[T]he 'cardinal canon' of statutory construction" is that "Congress 'says in a statute what it means and means in a statute what it says there.'"  *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 968 (9th Cir. 2013) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). Congress chose to fashion the FAAAA's safety exception to encompass the State's safety regulatory authority with respect to the broader category of "motor vehicles," generally, instead of the more limited set of vehicles denoted by the term "[m]otor carriers of property." 49 U.S.C. § 14501(c).  Accordingly, as tow trucks are engaged in towing other motor vehicles, the exception in

terms extends to "safety regulatory authority" concerning the vehicles towed.

Furthermore, "[t]he phrase 'with respect to' is generally understood to be synonymous with the phrase[] 'relating to.'" *In re Plant Insulation Co.*, 734 F.3d 900, 910 (9th Cir. 2013). And, although the "the breadth of the words 'related to' does not mean the sky is the limit," the Supreme Court has reiterated that the "ordinary meaning of . . . [the] words ['related to'] is a broad one," meaning "having a connection with or reference to." *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) (second alteration in original) (internal quotation marks omitted); *see also Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422, 1428, 1430–31 (2014). Consequently, the FAAAA's safety exception exempts from preemption safety regulations that "hav[e] a connection with" motor vehicles, not only those that directly govern the physical operation of the tow trucks themselves. *See Dan's City*, 133 S. Ct. at 1778.

Consistent with the statutory language, *Ace Auto Body & Towing, Ltd. v. City of N.Y.*, 171 F.3d 765, 774 (2d Cir. 1999), *holding modified on other grounds by Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136 (2d Cir. 2006), specifically rejected the argument that the safety exception "extends only to safety regulation of the mechanical components of motor vehicles." Noting that "[n]either the text nor the legislative history of § 14501(c)(2)(A) supports such a narrow reading," *Ace Auto Body* concluded that even if the phrase "safety regulatory authority . . . with respect to motor vehicles" were ambiguous, it must be read "to encompass the authority to enact safety regulations with respect to motor vehicle accidents and break-downs." *Id.*

More generally, and contrary to CTTA's arguments, "[c]ase law . . . has on the whole given a broad construction to the safety regulation exception." *VRC LLC v. City of Dallas*, 460 F.3d 607, 612 (5th Cir. 2006). *Ours Garage* specifically rejected "the narrowest possible construction of the [safety] exception," 536 U.S. at 440, noting that Congress's clear purpose in enacting § 14501(c)(2)(A) was "to ensure that its preemption of States' economic authority over motor carriers of property . . . 'not restrict' the preexisting and traditional state police power over safety," *id.* at 439.

We have likewise held that towing regulations directed at safety in a fairly broad sense are exempt from preemption under the FAAAA's safety exception. *Tillison v. City of San Diego*, 406 F.3d 1126, 1127 (9th Cir. 2005), for example, held that a state law requiring towing companies to obtain written authorization before removing a vehicle from private property, fell within the FAAAA's safety exception. In so holding, *Tillison* emphasized the California Legislature's statement that it enacted the statute

> "to further the safety of the general public by ensuring that a private property owner or lessee has provided his or her authorization for the removal of a vehicle from his or her property, thereby *promoting the safety of those persons involved* in ordering the removal of the vehicle as well as those persons removing, towing, and storing the vehicle."

*Id.* at 1129–30 (emphasis added) (quoting Cal. Veh. Code § 22658(m)(2)). *Tillison v. Gregoire* similarly held a state

law restricting patrol and nonconsensual towing exempted by the FAAAA's safety exception, listing a number of possible "safety purposes" animating the law, including "prevent[ing] involuntary tows and towing mistakes, reduc[ing] confrontations, and expedit[ing] vehicle recovery." 424 F.3d at 1100–01, 1104. Some of these purposes — for example, reducing confrontations — are related to the safety of individuals affected by the towing process, but not directly to the safe operation of the tow trucks when in use as a vehicle.

Finally, in addition to the Second Circuit in *Ace Auto Body*, our other sister circuits have interpreted the scope of the FAAAA's safety concept consonantly with our cases. *Cole v. City of Dallas*, 314 F.3d 730 (5th Cir. 2002) (per curiam), for instance, held a Dallas regulation prohibiting the issuance of a tow driving permit to persons who had been convicted of certain drug crimes to be "a motor vehicle safety regulation under 49 U.S.C. § 14501(c)(2)(A)." *Id.* at 731. "It is difficult to imagine," the court explained, "a regulation with a more direct protective nexus or peripheral economic burden." *Id.* at 735. *Cole* emphasized that *Ours Garage* "anchored" its interpretation of the FAAAA's safety exception "to Congress's desire to leave for the states and local governments those responsibilities regarding motor carriers that do not relate to the slender congressional goal of addressing *economic* authority over such carriers." *Id.* at 733. Accordingly, *Cole* "decline[d] to elasticize Congress's economic goal by narrowly interpreting 'safety regulatory authority of a State with respect to motor vehicles.'" *Id.* at 734; *see also VRC LLC*, 460 F.3d at 615 (holding that an ordinance requiring explanatory signs concerning towing fell within the FAAAA's safety exception as possible "violent confrontation between unwarned vehicle owners and tow truck drivers" could be remedied by a sign requirement);

*Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1251–52 (11th Cir. 2003) (concluding that a nonconsensual towing ordinance requiring permits and written authorization to tow fell within the FAAAA's safety exception).

In sum, the FAAAA's safety exception does not, as CTTA contends, limit the set of valid safety rationales in this context to those concerned only with the safe physical operation of the tow trucks themselves. Rather, regulations that are "genuinely responsive" to the safety of other vehicles and individuals involved in the towing process may also be exempted from preemption. Keeping this proper understanding of the FAAAA's safety concept in mind, we turn to CTTA's specific challenges to San Francisco's Permit Scheme.

## IV.

We first analyze CTTA's challenge to the Permit Scheme's general permit requirements. We then address the remaining provisions enabling the operation of the Permit Scheme, such as the requirements concerning applications, fees, permit possession and display, and penalties.

## A.

The Permit Scheme's requirements that tow car operators and tow car firms hold a City-issued permit while operating in San Francisco, S.F. Police Code §§ 3000, 3050, clearly fall within the FAAAA's preemption clause, as they are "related to a . . . service of [a] motor carrier," 49 U.S.C. § 14501(c)(1). But the permit requirements, we hold, fall within the Act's safety exception.

In applying the safety exception, we first "consider available legislative or regulatory intent" to evaluate "whether safety relating to motor vehicles was truly a concern," using "whatever traditional sources of legislative intent are available." *CTTA I*, 693 F.3d at 860, 864. Neither party has cited legislative history dating from the initial enactment of these ordinances, which may not exist. When amending Article 30.1 in 2009, however, the Board of Supervisors made explicit findings, some of which are directly concerned with safety.

Specifically, the Board found "that there is a significant risk to the safety of residents and visitors when illegal towing from private property occurs at night," and "that there is a risk to public health and safety when the vehicles of senior citizens and persons with disabilities are illegally towed from private property." S.F. Police Code § 3055.2(a)(ii), (iii). CTTA maintains that *only* these safety-related findings are relevant to evaluating the Permit Scheme. But that argument assumes that the only safety concerns relevant to the preemption analysis are those expressly stated in section 3055.2(a). That is not so. As *CTTA I* emphasized, a safety justification "can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances." 693 F.3d at 864.

Here, as in *Gregoire*, it is "reasonable to conclude" from the Permit Scheme's subject matter that the legislature "had public safety in mind when it passed [the law]." 424 F.3d at 1103. Indeed, the California state law allowing municipalities like San Francisco to regulate towing services demonstrates clear safety concerns. *See* Cal. Veh. Code

§ 21100(g)(2).[7]  Furthermore, the Coggan Declaration —
although not direct evidence of the Board's intent, as it was
produced after the Permit Scheme was enacted — can be
considered to establish the "surrounding circumstances" in
which the ordinances were passed. *CTTA I*, 693 F.3d at 864.
That is, the Declaration is evidence of the broad range of
safety problems arising in the towing industry, such as the
"operati[on] [of] tow trucks in an unsafe manner on the road,"
"stealing merchandise from towed vehicles," and instances of
physical or sexual assault by tow operators or their
employees.

Viewing the various indices of regulatory intent in
combination, we find that "safety relating to motor vehicles
was truly a concern" that motivated the Board of Supervisors
to enact the challenged permit requirements.[8]  *CTTA I*,
693 F.3d at 860.  These safety concerns include the limited
set articulated when enacting the 2009 amendment to Article

---

[7] The California Legislature, in enacting section 21100(g)(2), found:

> [T]hat the safety and welfare of the general public is
> promoted by permitting local authorities to regulate tow
> truck service companies and operators by requiring
> licensure, . . . thereby ensuring against towing mistakes
> that may lead to violent confrontation, [and] stranding
> motorists in dangerous situations . . . . *Id.*

[8] To be sure, CTTA's observation that the Permit Scheme is animated,
in part, by consumer protection concerns is accurate. *See* S.F. Police Code
§ 3055.2(a)(iv)–(viii).  That the Board had reasons other than safety for
enacting the regulation, however, does not compel the conclusion that the
Board's safety-related findings are "pretextual." *CTTA I* instructed that
"mixed motives" do not affect the safety-exception analysis so long as the
challenged regulations have a "logical connection" to the "safety
justification." 693 F.3d at 860.

30.1 — the risk posed by illegal towing from private property at night or involving a vehicle belonging to senior citizens and persons with disabilities — but are not limited to those concerns. Rather, we may infer from the other indices that broader safety concerns, including safe operation of the trucks, physical or sexual assault, the possibility of violent confrontations, and the stranding of motorists in dangerous situations, also underlay the enactment of the challenged permit requirements.

The second prong of the safety exception analysis requires us to "assess the nexus between the provision at issue and the safety concern." *CTTA I*, 693 F.3d at 860. That nexus is more than sufficient.

That the permit requirements have a significant and logical relationship to safety is evident. As the district court stated, "the presence of a permit requirement implies the threat of permit revocation," which makes the requirement "a tool for policing misconduct in the towing industry." Furthermore, the permit requirement enables the City proactively to "weed out" and monitor tow car drivers and firms on an ongoing basis.

CTTA maintains that a more appropriate safety response by the City would be "to increase the criminal penalties for [illegal towing]," instead of creating a scheme that "places enormous regulatory and economic burdens on legitimate towing firms." But the FAAAA's safety exception does not save from preemption only the least intrusive methods of promoting safety. Moreover, as Sergeant Coggan reasonably observed, it may well be that "the threat of permit nonrenewal or revocation by administrative action is more effective than the threat of criminal or civil prosecution, given the relative

certainty and timeliness of the administrative process." CTTA offers no reason to doubt this assessment.

Taking another tack, CTTA complains that the City has produced "no evidence" that the Permit Scheme has in fact increased safety or reduced the incidence of illegal towing, contending that the record evidence is "entirely bereft of any statistical data" or other "empirical data." But a regulation falls within the FAAAA's safety exception if it is "genuinely responsive to safety concerns," a test we have described as requiring "a *logical connection* to motor vehicle safety." *CTTA I*, 693 F.3d at 860 (emphasis added) (internal quotation marks omitted). That is, the safety exception is concerned with legislative *intent*, not legislative *effectiveness*.

As a third line of attack, CTTA contends that the permit requirements are not *facially* concerned with safety. In CTTA's view, permissible safety regulations include regulations such as "requiring tow truck drivers to pass a driving test, or to demonstrate competence in towing motor vehicles," not permit requirements. This argument rests on CTTA's incorrect understanding of the FAAAA's safety concept, *see* Part III, *supra*. As we have explained, the safety exception is not limited to regulations that narrowly address "on-the-road" safety for tow trucks; rather, it extends to regulations that protect safety in connection with motor vehicles towed and the individuals who interact with tow truck operators and firms. *See, e.g.*, *Tillison*, 406 F.3d at 1127; *Gregoire*, 424 F.3d at 1100–01; *VRC LLC*, 460 F.3d at 609, 615; *Galactic Towing*, 341 F.3d at 1251–52; *Cole*, 314 F.3d at 731. CTTA cannot plausibly claim that revoking the permit of those tow car drivers and firms who commit misconduct related to their services, strand motorists in dangerous locations, or operate dangerously is not logically

connected to improving the safety of individuals involved in the towing process.

Finally, CTTA invokes *Automobile Club of New York, Inc. v. Dykstra*, 520 F.3d 210 (2nd Cir. 2008). *Dykstra* involved a challenge to New York City's comprehensive regulation of the towing industry "as applied to tow trucks from outside New York City." *Id.* at 212. Holding that "[e]nforcing the Scheme against tow trucks passing through New York City or towing vehicles into New York City does not respond to safety concerns and does not fall within the safety exception," *id.* at 217, *Dykstra*, presumably because it focused on those questions, did not discuss — or even cite — earlier decisions like *Cole*, *VRC*, or *Galactic Towing*, all of which held that the FAAAA's safety exception covers towing permit regulations affecting in-jurisdiction operators. Notably, *Dykstra* observed that tow trucks *from* New York City "would presumably already be licensed" under the city's permit regulation, without questioning the validity of that regulation. *Id.* at 217. *Dykstra* was thus primarily concerned with the application of New York City's permit regulation to vehicles coming from outside the City.[9] The case does not support CTTA's position in this case.

In sum, the permit requirements of sections 3000 and 3050 are "genuinely responsive" to the set of real safety concerns that underlay enactment of the Permit Scheme. Accordingly, these requirements fall within the Act's safety exception, and so are exempted from preemption.

---

[9] The question of extraterritorial application is irrelevant in this case, as the California Court of Appeal held that the Permit Scheme applies only to those towing firms whose "principal place of business or employment" is San Francisco. *See* n.3., *supra*.

B.

The district court concluded that the majority of the remaining provisions fell within the FAAAA's safety exception, while others were not covered by the FAAAA's preemption clause in the first place. CTTA's arguments concerning these provisions for the most part suffer from the same infirmities that undermine its arguments concerning the general permit requirements. As the district court properly conducted a thorough "provision-by-provision" analysis, we address most of the provisions only in brief. We separately address thereafter section 3052's complaint-handling system and business plan requirements, *see* S.F. Police Code § 3052(4).

1. *Permit Application Requirements, Sections 3002 and 3052*

The district court concluded that the Permit Scheme's application and information-collection requirements fall within the FAAAA's safety exception.[10]  We agree.

Requiring tow car operators and tow car firm applicants to submit identification information as part of their applications is "logical[ly] connect[ed]," *CTTA I*, 693 F.3d at 860, to the safety of individuals potentially threatened by such drivers or firms. Those requirements allow the police

---

[10] The district court also concluded that the application requirements are subject to the FAAAA's express preemption clause; the City does not contest that conclusion. We thus assume without deciding that the requirements would be preempted if they did not fall within the safety exception.

more easily to identify drivers and firms that commit wrongdoing or misconduct.

One of the primary ways by which the Permit Scheme genuinely responds to safety concerns is by providing police the capability proactively to monitor the towing industry, a capability that is predicated on the police having basic information about tow car drivers. CTTA in fact concedes that such identifying information "may be helpful to the police in identifying tow truck drivers," but argues that such identification "does nothing to improve towing safety" and ensure that drivers "will operate their vehicle safely." But, as we have explained, the Act's safety concept is not limited to the safe physical operation of the tow trucks. Instead, it includes protection of customers, who may be in vulnerable situations, from dangerous or irresponsible tow truck operators. Accurate identification of the tow car operator and car firm operators helps to provide such protection.

CTTA contends in particular that the requirements that applicants provide criminal history information as part of their application, *see* S.F. Police Code §§ 3002(5), 3052(7), are preempted by the FAAAA. That these requirements "genuinely respon[d]" to safety concerns is quite apparent. Indeed, "[i]t is difficult to imagine a regulation with a more direct protective nexus or peripheral economic burden." *Cole*, 314 F.3d at 735.[11]

Finally, CTTA argues that, in any event, requiring driver permit applicants to list all criminal offenses for which they

---

[11] For the same reason, the Permit Scheme's provisions allowing for permit denial or revocation due to criminal activity, S.F. Police Code §§ 3004, 3011, 3054(3) & 3056(1), fall within the Act's safety exception.

have been *arrested* is not responsive to safety concerns, because an arrest is "not competent evidence of any wrongdoing." That observation is quite valid, and curbing the misuse of arrest records is a legitimate concern.[12] As the City points out, however, "the Police Code does not allow a permit denial based solely on arrest"; any such denials would be extremely troublesome and could be separately challenged.[13] Simply collecting information on arrests is

---

[12] *See* Gary Fields & John R. Emshwiller, *As Arrest Records Rise, Americans Find Consequences Can Last a Lifetime*, Wall St. J. (Aug. 8, 2014) (observing that "nearly one out of every three American adults" have arrest records, and that "[m]any people who have never faced charges, or have had charges dropped, find that a lingering arrest record can ruin their chance to secure employment, loans and housing").

In recent guidance concerning the use of criminal records in the employment context, the Equal Employment Opportunity Commission explained: "The fact of an arrest does not establish that criminal conduct has occurred. Arrests are not proof of criminal conduct. Many arrests do not result in criminal charges, or the charges are dismissed." EEOC Enforcement Guidance No. 915.002, *Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964* (2012), *available at* http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm. The EEOC further observed that many states "have enacted laws to limit employer inquiries concerning all or some arrest records." *Id.* n.101. In California, for example, employers — "whether a public agency or private individual or corporation" — are generally prohibited from "ask[ing] an applicant for employment to disclose . . . information concerning an arrest or detention that did not result in conviction." Cal. Lab. Code § 432.7(a).

[13] The Permit Scheme does allow denial or revocation of a permit where the driver has "acted in violation" of the listed criminal statutes, even if not convicted. S.F. Police Code § 3004(b). CTTA provides no substantive argument challenging this particular ground for denial, either on the merits or with regard to any procedures that might be required before denying a permit on that ground. *See United States v. Kama*,

nonetheless pertinent to assuring accurate identification of drivers, as arrest records contain identifying information, including fingerprints and usage of aliases.

In sum, the Permit Scheme's application requirements, including the criminal history disclosure requirements, fall within the scope of § 14501(c)(2)(A), and are therefore not preempted.

## 2.  *Permit Fees, Section 3003 and 3053; Penalties, Sections 3012 and 3064*

The district court correctly concluded that the permit fee and penalty provisions fall within the safety exception.

The filing and license fees reimburse the City for the costs of processing the application.  The permit fees thus directly support the Permit Scheme's other requirements.  As the district court explained, "that the permit fee requirements regulate somewhat more indirectly is not by itself fatal, for, like the essential permit requirements themselves, they remain 'logically' and 'genuinely' connected to obvious [safety] concerns."[14]  "[I]t would make no sense to conclude

---

394 F.3d 1236, 1238 (9th Cir. 2005) ("Generally, an issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief.").

[14] CTTA argues that this analysis is contrary to *CTTA I*'s instruction to examine a preemption challenge to a comprehensive law on a "provision-by-provision basis."  693 F.3d at 860.  Yet CTTA's argument overstates the meaning of *CTTA I*'s instruction.  A provision-by-provision analysis ensures that "the mere fact that one part of a regulation or group of regulations might come within an exception to preemption does not mean that all other parts of that regulation or group are also excepted." *Id.*

that certain provisions of the [Permit Scheme] are not preempted because they are genuinely responsive to safety concerns, but that the state is forbidden from taking measures to make those provisions effective." *Prof'l Towing & Recovery Operators of Ill. v. Box*, 965 F. Supp. 2d 981, 1003 (N.D. Ill. 2013).

The penalty provisions for driving or operating a tow truck in the City without requiring the requisite permit are likewise integral to the functioning of the Scheme's permit requirement. Absent some penalty for noncompliance, the permit requirement would be a dead letter. CTTA's only argument is a reiteration of its basic theme: "While the threat of misdemeanor convictions may serve as a deterrent to encourage drivers to comply with the ordinance, there has been no showing that complying with the ordinance enhances the safety of the motoring public." Repeating the same refrain does not improve it.

We thus hold that the fee and penalty provisions fall under the safety exception and are not preempted.

3. *Possession and Display Requirements, Section 3007 and 3055*

The district court concluded that the permit possession and display requirements "are not subject to FAAAA preemption" in the first place, as displaying a permit does not constitute a "service" under § 14501(c)(1). CTTA argues to the contrary — that directing "drivers to affirmatively

(internal quotations omitted). But *CTTA I* could not possibly require courts to ignore the particular function of a provision in the context of the comprehensive scheme, as doing so would result in absurd outcomes.

perform an act," such as display a permit to a police officer, is inherently a "service."

We cannot agree with CTTA. A requirement designed to demonstrate compliance with a legal obligation is not ordinarily termed a "service." One who hands over his driver's license to a police officer when stopped for a traffic violation, for example, is not providing a "service" to the officer. Moreover, the only state laws "whose effect is forbidden under [the FAAAA] are those with a significant impact on carrier rates, routes, or services." *Rowe*, 552 U.S. at 375 (internal quotation marks and emphasis omitted). CTTA has not shown that the permit possession and display requirements affect its members in any significant manner distinct from the requirement of obtaining the permit in the first place.

Consequently, sections 3007 and 3055 are not preempted by the FAAAA.[15]

---

[15] *Dan's City* recently held that for FAAAA preemption to apply, "it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier *in any capacity*; [it] must also concern a motor carrier's '*transportation of property*.'" 133 S. Ct. at 1778–79 (emphasis added). *Dan's City* further explained that the "with respect to transportation of property" phrase "massively limits the scope of preemption ordered by the FAAAA." *Id.* at 1778 (internal quotation marks omitted); *see also Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 23 (1st Cir. 2014) ("[T]he FAAAA is carefully tailored to preempt only those statutes that affect a motor carrier's transportation of property."). The permit possession and display requirements may escape preemption for this additional reason, as they do not appear related to services "with respect to transportation of property." *Cf. Dan's City*, 133 S. Ct. at 1779 (defining "transportation" as "services related to th[e] movement" of property, "including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing,

4. *Complaint System and Business Plan Requirements, Section 3052(4)*

To obtain a tow car firm permit, applicants must include in their application "[a] description of the applicant's business plan, . . . and a system for handling complaints that is acceptable to the Chief of Police." S.F. Police Code § 3052(4). The district court concluded that both requirements fell within the FAAAA's safety exception.[16] While we agree that the complaint system requirement genuinely responds to safety concerns, we conclude that the business plan requirement falls outside of the safety exception and is therefore preempted.

**(a)** Requiring tow car firms to have acceptable systems for handling customer complaints is logically connected to improving safety.

First, as the district court found, "having such a complaint system in place could reduce the incidence of heated confrontations" between tow car firm employees and individuals whose vehicles were towed. It is reasonable to conclude that individuals who are upset or angered by the towing process are less likely personally to confront tow car firm operators or employees when they are aware that there is an official mechanism for handling their complaints. And reducing such confrontations, we have held, is a permissible

---

ventilation, storage, handling, packing, unpacking, and interchange of passengers and property" (quoting 49 U.S.C. § 13102(23)(B)).

[16] The City's counsel agreed at oral argument that the section 3052(4) requirements are covered by the FAAAA's express preemption clause. We so assume for the purposes of this opinion.

safety-related concern under the FAAAA. *See Gregoire*, 424 F.3d at 1103–04.

Second, having an effective complaint system can alert the tow car firm *itself* to alleged unsafe conduct by its drivers or employees. Most fundamentally, the complaint system is simply an alternative mode of enforcement of the valid safety regulations. That is, although the complaint system may not in itself be a direct safety regulation, it — like the Permit Scheme's fee and penalty provisions — helps to effectuate the Scheme's direct safety-related regulations. Accordingly, this requirement falls within the FAAAA's safety exception.

**(b)** The remainder of section 3052(4)'s business plan requirement, however, does not fit the safety rubric, even as broadly understood. The district court held that the Board's purpose in enacting this provision was "to ascertain whether a permitted towing firm would be able to make ends meet without resorting to illegal means." The City also points to the Coggan Declaration, which states that the business plan allows the City to "assess whether the [applicant] companies have a plan to transport and store vehicles in a safe manner."

These asserted roles for the business plan requirement are belied by the fact that no enforcement provisions are linked to the requirement. The failure to include a business plan in the application is not a ground for denying or revoking a tow car permit. *See* S.F. Police Code §§ 3054, 3056. Any connection between the business plan requirement and the ascertainment of safe practices or capacities is ephemeral.

Moreover, the City's evidence suggests that the business plan requirement is intended to further *consumer protection*, not safety. For example, Coggan stated that, "[b]y requiring

that companies submit business plans and proposed services to be provided, the Department can better determine whether the amount charged by a tow company is commensurate with the services it regularly provides." In sum, unlike the other challenged provision, the business plan requirement is just not genuinely responsive to safety concerns, and so is preempted.

We therefore must consider whether the business plan provision (except for the complaint requirement) is severable from the remainder of the Permit Scheme. *CTTA I* explained that the Scheme's severance provisions, *see* S.F. Police Code §§ 3013, 3065, allow us "to sever a particular provision if it would not affect the Permit [Scheme] as a whole." 693 F.3d at 863. "Severability of a local ordinance is a question of state law . . . ." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988). In California, the presence of a severability clause "establishes a presumption in favor of severance." *Cal. Redevelopment Ass'n. v. Matosantos*, 53 Cal. 4th 231, 270 (2011). Additionally, "[t]he invalid provision must be grammatically, functionally, and volitionally separable." *Id.* at 271.

Grammatical separability — "whether the invalid parts can be removed as a whole without affecting the wording or coherence of what remains," *id.* (internal quotation marks omitted) — is certainly satisfied. Section 3052(4) is a freestanding provision, and so unconnected grammatically to the rest of the enactment. And after severance, the revised section reads: "A description of . . . a system for handling complaints that is acceptable to the Chief of Police," a perfectly coherent requirement.

The latter two severability criteria are also met. The business plan requirement is a minor — even tangential — provision of the Permit Scheme.  It is neither a requirement for obtaining a permit nor a means of facilitating, supporting, or enforcing the permit requirement.  Its invalidation therefore in no way affects the "measure's operation and purpose," making it functionally severable, nor is it of "critical importance to the measure's enactment," making it volitionally separable.  *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal. 4th 585, 613 (1999).

We hold that the business plan requirement is preempted by the FAAAA, but that the requirement is severable from the valid complaint requirement contained in section 3052(4), and from the Permit Scheme more generally.

5.  *Miscellaneous Provisions*

The district court properly concluded that the Permit Scheme's recordkeeping requirement, S.F. Police Code § 3060, is saved from preemption by the FAAAA's safety exception.  Like the permit application requirements, the recordkeeping requirement allows the police more easily to identify drivers and firms that have committed wrongdoing or misconduct.  Without accurate records, it may be difficult for law enforcement to investigate alleged dangerous activities, thus reducing the Permit Scheme's potential for deterring unsafe conduct.

Likewise, the district court correctly determined that section 3055.2, which requires tow firm operators to display brochures containing a concise summary of California towing law "in a conspicuous place in the location where a vehicle owner must come to reclaim their towed vehicle," S.F. Police

Code § 3055.2(c), falls within the FAAAA's safety exception. The Board of Supervisors made its safety-related findings when adding the brochure requirement in 2009. *See id.* § 3055.2(a)(ii)–(iii). This timing indicates a connection between the requirement and the Permit Scheme's safety concerns. Nor is there any indication that the Board's findings were pretextual. As the district court explained, the requirement is "obviously aimed at discouraging improper towing . . . and prevent[ing] illegal tows [] evinces a genuine motor vehicle safety concern." Like a requirement that tow car firms post explanatory signs, upheld by the Fifth Circuit in *VRC LLC*, 460 F.3d at 615, the brochures required by the Permit Scheme promote safety by providing consumers with information that could reduce confrontation. Furthermore, the brochure requirement, like the fees and penalties provisions, enable the effectiveness and enforcement of the other safety-related provisions by ensuring that customers are aware of their rights, and so able to register complaints when they are violated. *Cf. Prof'l Towing*, 965 F. Supp. 2d at 1003.[17]

In sum, the Permit Scheme's recordkeeping and brochure requirements fall within the FAAAA's safety exception, and are therefore saved from preemption.

## V.

We reverse the district court's grant of summary judgment to the City as to section 3054(2)'s business plan requirement, and remand to the district court for further

---

[17] Of course, for the brochure requirement to survive preemption, the concise summary of state laws included in the brochure must not refer to any laws that themselves are preempted.

proceedings consistent with this opinion.   We otherwise affirm the district court's judgment.[18]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

CTTA will bear the costs of appeal.

---

[18] We note that no argument concerning the amount of the fees was presented to this panel in the briefs or at oral argument.