# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50115

UNITED MOTORCOACH ASSOCIATION, INCORPORATED,

 Plaintiff - Appellant

v.

CITY OF AUSTIN,

 Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 17, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal raises the issue of whether federal law preempts a city's exercise of regulatory authority over the intrastate operation of charter buses. A national association of charter-bus companies sought to enjoin regulations affecting their operations enacted by the City of Austin, Texas. The district court held that the regulations were not preempted. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

An Austin city ordinance regulates "charter bus service," which it defines as "transportation provided for compensation at the request of a third party for the exclusive use of a vehicle with a capacity of at least sixteen

No. 16-50115

persons . . . providing service originating, terminating and travelling solely within the city limits." AUSTIN CITY CODE § 13-2-1(1).  Under the first set of relevant regulations, the "permitting regulations," operators of charter-bus service must obtain a city permit, which requires them to submit an application including various pieces of information as to the association between the holder and its vehicles, the applicant's criminal history, current vehicle inspections and drivers' licenses, and proof of valid federal or state operating authority. *Id.* § 13-2-253.

The permitting regulations also regulate charter-bus operations within Austin.  Matters covered include how passengers may be dropped off in relation to the curb and what must be done if a bus breaks down. *Id.* §§ 13-2-270, 271. Failure to comply with the permitting regulations can lead to revocation or suspension of an operator's permit. *Id.* § 13-2-263.  The ordinance also contains another set of regulations, the "decal regulations," which require each operator to display at all times a decal of its permit and, when relevant, a "special event permit." *Id.* § 13-2-267, 285.

In 2013, United Motorcoach Association ("UMA"), a national association of professional bus companies, filed this suit against the City seeking a permanent injunction against both the permitting and the decal regulations. It argued that the regulations are preempted by federal law.  In March 2014, the district court denied a preliminary injunction on any part of the regulations except for two provisions that are not at issue in this appeal.  After UMA amended its complaint in early 2015, cross-motions for summary judgment were filed in July.  In January 2016, the district court granted UMA a permanent injunction as to the decal regulations but denied any further relief. UMA's appeal solely concerns the district court's ruling denying relief as to the permitting regulations.  The City has not appealed.

2

No. 16-50115

DISCUSSION

The arguments about preemption are based on a federal statute captioned "Federal authority over intrastate transportation." *See* 49 U.S.C. § 14501. It provides that States and their governmental subdivisions may not enforce rules affecting interstate or intrastate transportation by a motor carrier of passengers, with identified exceptions. *Id.* § 14501(a). There is much more to the statute, and we will presently analyze the relevant parts.

In determining a federal statute's preemptive reach, congressional purpose is "the ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted). "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue," and "in the first instance [we] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Nonetheless, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 432 (2002) (quotation marks omitted). That means that when there is "more than one plausible reading [of the text, we] ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation marks omitted).

The preemption issue that remains in this suit arises from the district court's holding that a savings clause in the statute exempted the permitting regulations from preemption.[1] We thus address only whether the permitting regulations are preempted.

_____

[1] On appeal, UMA argues for the first time that the district court should have enjoined Austin City Code § 12-2-269, which requires charter-bus operators to maintain certain forms of identification. UMA raised this latter argument for the first time in its response to the

No. 16-50115

The party seeking a permanent injunction must satisfy a four-part test: it must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest. *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). We start with the district court's preemption rulings, which are legal issues we review *de novo*. *Id.*

The key sections of the statute at issue provide:

(a) MOTOR CARRIERS OF PASSENGERS.—

(1) LIMITATION ON STATE LAW.—No State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to— . . .

> (C) the authority to provide intrastate or interstate charter bus transportation.

(2) MATTERS NOT COVERED.—Paragraph (1) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, [among other things] . . . .

§ 14501(a). The parties agree the City's permitting regulations fall within the language of Section 14501(a)(1)(C) because such regulations relate to "the authority to provide intrastate or interstate charter bus transportation." Our analysis is thus confined to whether Section 14501(a)(2) nonetheless applies to save the regulations from preemption.

UMA contends the permitting regulations do not qualify as an exercise of the City's[2] "safety regulatory authority" under Section 14501(a)(2) for two

---

City's motion for summary judgment. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). The argument has been forfeited.

[2] That Austin is a municipality, not a "State," makes no difference here. "Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the

reasons. First, UMA argues Section 14501(a)(2)'s plain language indicates that cities may not regulate charter-bus permitting even if such regulations are responsive to safety. Second, UMA argues that, even if the City may regulate charter-bus permits in some circumstances, it did not meet its burden of showing the permitting regulations were genuinely responsive to safety. We now address each argument.

## I.    *Section 14501(a)(2)'s General Applicability*

We start with whether Section 14501(a)(2) applies to charter-bus permitting generally. Although no court has addressed the scope of Section 14501(a)(2)'s safety exception, we do not write on a blank slate. Following the Supreme Court's opinion in *Ours Garage*, we have, along with other circuits, interpreted language in Section 14501(c)(2)(A)[3] that is identical to the language in Section 14501(a)(2). *See VRC*, 460 F.3d at 612; *Cole v. City of Dallas*, 314 F.3d 730, 733–35 (5th Cir. 2002); *see also Ours Garage*, 536 U.S. at 432; *California Tow Truck Ass'n v. City & Cnty. of San Francisco*, 807 F.3d

---

traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429. Under the Texas Constitution, home-rule cities such as Austin "have all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter." *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 n.6 (Tex. 2016) (quotation marks omitted). UMA's opening brief does not argue any specific Texas law denying the City such authority. Any such argument is abandoned. *See Edwards v. Johnson,* 209 F.3d 772, 775 n.1 (5th Cir. 2000).

[3] Section 14501(c)'s structure is parallel to Section 14501(a), in that it contains a general preemption rule and an exception. Specifically, it provides:
(c) MOTOR CARRIERS OF PROPERTY.—
(1) GENERAL RULE.— . . . a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or another provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.
(2) MATTERS NOT COVERED.—Paragraph (1)—
(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, [among other things] . . . .

1008, 1020 (9th Cir. 2015). The City argues we should interpret Section 14501(a)(2) with reference to *Ours Garage* and these subsequent opinions.

In *Ours Garage*, the Supreme Court held that Section 14501(c)'s safety exception applies to municipal as well as state tow-truck regulations. *Ours Garage*, 536 U.S. at 431–32. When discussing the exception, the Court explained that through it "Congress' clear purpose" was "to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over safety." *Id.* at 439. The Court did not then apply the exception to the regulations at issue; it "express[ed] no opinion" on whether they qualified as exercises of the city's "safety regulatory authority." *Id.* at 442. Instead, it noted that question would turn on whether the regulations were "genuinely responsive to safety concerns . . . ." *Id.*

Later courts "applying the principles discussed in *Ours Garage* [have] on the whole given a broad construction to the safety regulation exception." *VRC*, 460 F.3d at 612; *see also Houston Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 449–51 (5th Cir. 2016); *Cole*, 314 F.3d at 734–35. This court has rejected a searching standard "wherein the court inquires closely into the legitimacy of the municipality's safety concern and ensures that it is not a guise for economic regulation." *VRC*, 460 F.3d at 612–13. Instead, "we have looked to statements of intent on the face of the ordinance, demonstrating that it was designed to promote safety, as well as to evidence that there was a 'nexus between the ordinance and public safety.'" *Houston Prof'l Towing Ass'n*, 812 F.3d at 449 (alteration omitted) (quoting *VRC*, 460 F.3d at 614–15). In other words, when applying Section 14501(c)'s safety exception, we have asked two key questions: "(1) whether the ordinance evinced a safety purpose and (2) whether it promotes safety." *Id.* When engaging in this analysis, we have also

considered the economic burden on those regulated by the ordinance. *VRC*, 460 F.3d at 615.

Here, the district court concluded that "*Ours Garage*, *California Tow Truck Association*, and other decisions interpreting and applying § 14501(c)(2)(A) may appropriately be considered in interpreting and applying § 14501(a)(2), as both subsections use identical language." We agree. Both experience and common sense support the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Sections 14501(a)(2) and (c)(2)(A) are not merely identical; they inhabit the same section and mirror one another in structure and purpose. Each limits the immediately preceding broad preemption clause, and in each provision the text and context shows that "Congress' clear purpose . . . is to ensure that its preemption of States' economic authority over motor carriers . . . 'not restrict' the preexisting and traditional state police power over safety." *See Ours Garage*, 536 U.S. at 439 (quoting § 14501(c)(2)(A)).

To convince us to deviate from this other caselaw, UMA argues the savings clause cannot save the permitting regulations because they "relat[e] to" the City's authority to provide charter-bus transportation and are therefore preempted under Section 14501(a)(1)(C). UMA contends that the savings clause is framed generally while the preemption clause is framed specifically, so the specific preemption clause should prevail. True, when there is conflict between two provisions, the ordinary rule is that a specific provision will prevail over the general one. *See Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). We find no conflict, though. Also, we think it incorrect to try to label these as general and specific provisions. They work in tandem, such that the savings clause clarifies that the preemption clause does not restrict the traditional state police power over safety. *See Ours Garage*, 536 U.S. at 439.

7

No. 16-50115

Finally, the savings clause does not swallow the preemption clause; each retains effect. To interpret the savings clause so that it cannot save any preempted rule, on the other hand, would violate "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative . . . ." *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (quotation marks omitted).

Next, UMA attempts to distinguish the phrase "motor vehicles" (to which the safety exception applies) from "carriers" (to which the financial-responsibility exception[4] applies), seemingly suggesting that the disparate usage means states may regulate only the safety of the vehicle and nothing else. *See* § 14501(a)(2). The safety exception applies to the state's authority "with respect to motor *vehicles*," while the financial-responsibility exception applies to the state's authority "to regulate *carriers*." We agree, then, insofar as UMA argues that such disparate usage requires different meanings for each word — indeed, we heed "Congress' decision to use different terms to describe different categories of people or things." *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1708 (2012).

Yet UMA's argued-for conclusion does not follow. "[S]afety regulatory authority . . . with respect to motor vehicles" makes sense because charter-bus vehicles (the motor vehicles) may present safety risks; "minimum amounts of financial responsibility" as to "carriers" makes sense because charter-service operators (the carriers) are the financially responsible parties. Grammatically, "safety" modifies "regulatory authority," not "motor vehicles." Thus, the provision's language indicates that the referred-to authority is not merely as

---

[4] That exception, also within Section 14501(a)(2), reads: "Paragraph (1) shall not restrict . . . the authority of a State to regulate *carriers* with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." § 14501(a)(2) (emphasis added).

to the mechanical safety of motor vehicles themselves; rather, it is the state's "safety regulatory authority" as such authority is applied to motor vehicles. Such authority must include the type of permitting regulations we have previously held to be covered by that phrase. *See Cole*, 314 F.3d at 734–35. The interpretation we now adopt permits these terms to retain their distinct, natural meanings.[5]

We also disagree with UMA's argument that charter-bus permitting is not a "preexisting and traditional state police power" because cities only recently began regulating charter buses through permitting schemes. *See Ours Garage*, 536 U.S. at 439. Whether or not the regulatory history surrounding charter-bus permitting regulations qualifies them as "preexisting and traditional," it is clear that those terms modify "state police power," not the specific type of regulation at issue in a given case. Thus, when analyzing Section 14501(a)(2), that a *type of regulation* is new is irrelevant, so long as the *exercise of authority* is within the state's traditional safety-regulatory authority. The specific means of exercising such authority will doubtless change over time, but the nature of the authority itself will not. As noted, we have previously held this specie of regulation — permitting — is within the state's "safety regulatory authority." *See Cole*, 314 F.3d at 734–35.

There are distinctions, of course. Tow-truck and charter-bus industries may differ in geographic scope. Differences in practical effect may arise from similar constructions of the laws relating to each. Such differences, UMA argues, should counsel against construing Section 14501(a)(2)'s safety exception broadly, because a broad construction and application will lead to

---

[5] It would indeed make little sense to construe "with respect to motor vehicles" as narrowly as UMA argues. Under UMA's interpretation, for example, the City could require charter buses to use certain tire sizes, but it could not prohibit drinking and driving, even though drunk driving is undoubtedly a safety concern "with respect to motor vehicles."

the very "balkanization of permit regimes" Congress meant to curtail through the preemption provision. Such concerns notwithstanding, our focus is on the text of what Congress actually enacted. The specific exception to preemption, as we have explained, does not comfortably bear UMA's narrow reading. Nor will we interpret the exception narrowly to comport better with the broad policy goals of deregulation. "A congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of the exception." *See Ours Garage*, 536 U.S. at 440.

Finally, like the Supreme Court in *Ours Garage*, we take note of 49 U.S.C. § 31141, which authorizes the Secretary of Transportation to void any "State law or regulation on commercial motor vehicle safety" that, in the Secretary's judgment, "has no safety benefit . . . [or] would cause an unreasonable burden on interstate commerce." The Secretary, therefore, retains authority to invalidate non-safety-related laws *or* safety-related laws when they improperly burden interstate commerce. Given all this, the distinctions between Sections 14501(a) and (c) do not persuade us to construe "safety regulatory authority" more narrowly in the former than in the latter.

## II.    *Genuinely Responsive to Safety?*

We next ask whether the permitting regulations are "genuinely responsive" to safety. *See VRC*, 460 F.3d at 612. UMA argues the district court erred in analyzing this question because it did not conduct a provision-by-provision analysis. UMA contends that such a review reveals that certain permitting regulations were not responsive to safety concerns.

A provision-by-provision analysis of regulations generally should be undertaken to determine whether each provision is genuinely responsive to safety. *See, e.g.*, *California Tow Truck Ass'n*, 807 F.3d at 1014. Here, although

the district court did not go through the permitting regulations one by one in its order, we find no error in its analysis.   One reason is that, as UMA acknowledges, the district court heard testimony on the various provisions and requested provision-by-provision briefing.   In addition, UMA does not provide substantive analysis as to specific provisions that allegedly do not relate to safety, nor did it challenge the provisions in a provision-by-provision manner in district court.   In conducting its analysis as it did, the district court was simply addressing the arguments before it.

The question, then, is whether these regulations are responsive to Section 14501(a)(2)'s focus on safety.   The district court applied the Ninth Circuit's two-part test, asking (1) whether there was a safety motivation for the scheme and (2) whether there was a nexus between the provision and the safety concern.   *See id.* at 1019–20.[6]   Again, we agree that the caselaw interpreting and applying Section 14501(c)(2)(A) provides the appropriate analysis for analyzing preemption under Section 14501(a)(2).   Our cases have applied a test that is similar to the Ninth Circuit's.   *See Houston Prof'l Towing*, 812 F.3d at 449–51.   We now apply that test.

First, we look "to statements of intent on the face of the ordinance" to determine whether "it was designed to promote safety[.]"   *See id.* at 449.   Our caselaw is illustrative of our approach.   In *Cole*, we considered the preamble to an ordinance but did not discuss whether the city had entered any studies or expert testimony about the dangers being addressed.   *Cole*, 314 F.3d at 734–35.   The ordinance stated "that the proposed safety-related regulations for nonconsensual tows would promote the public safety" by, among other things, "contributing to a decrease in the potential for confrontation and violence . . . ."

---

[6] The district court cited to an earlier opinion in *California Tow Truck Association*, which was later modified by the Ninth Circuit.   For simplicity's sake, we cite only the modified opinion.   Which opinion is used does not affect our analysis.

No. 16-50115

*Id.* at 735. In light of the ordinance's expressed purpose and effect, we concluded the safety purpose was "manifest." *Id.* In *VRC*, we likewise found that there was a safety purpose when the city "considered the possibility of violent confrontation" as "a safety issue and found that" the ordinance would remedy it; when a city administrator testified "that there was a real problem with confrontation between citizens and tow truck drivers and that the signs had been helpful"; and when, "[l]ogically, the [ordinance's requirements] could . . . help to defuse the anger of some who actually were towed . . . ." *VRC*, 460 F.3d at 615.

We analyzed the safety exception in another case decided after the district court's order here. *See Houston Prof'l Towing Ass'n*, 812 F.3d at 449. There, we discussed the safety exception to determine whether a tow-truck association's challenge to a city ordinance was barred by res judicata. *Id.* at 448–49. The association had previously challenged the ordinance, but a district court held it to be within the safety exception. *Id.* at 446. Our analysis was thus limited to whether intervening amendments to the ordinance had changed the factual and legal basis for the association's claim of preemption. *Id.* at 449. After analyzing the applicability of the safety exception, we held they had not. *Id.* at 450–51. In doing so, we looked to the ordinance's preamble, which "contain[ed] a number of clauses discussing the safety motivations for the [ordinance]." *Id.* at 449–50. The preamble revealed the ordinance's purpose was "to promote safety by expeditiously clearing stalled and wrecked vehicles"; hence we concluded that "[t]here [was] no doubt that safety [was] the justification . . . ." *Id.* at 450.

Here, the ordinance contains numerous safety-purpose statements. *See* AUSTIN CITY CODE § 13-2-251. The ordinance states that various events make the City a destination for "masses of visitors," which "impact[s] public safety and impede[s] the flow of pedestrian and vehicular traffic." *Id.* For these

reasons, the City found its "regulations [would] help to protect and ensure that charter bus services use mechanically safe vehicles, operate their service in a safe manner, and . . . meet minimum insurance coverage requirements." *Id.* Also, after recounting a history of charter-bus accidents in Texas, the ordinance notes its effectiveness in preventing such "deadly accidents." *Id.* It makes clear that "the purpose of the . . . regulations is not to generate revenue but as enumerated above, to protect the public health, safety, and welfare." *Id.* These statements are similar to those that we have previously held to evidence a safety motivation. *See, e.g., Houston Prof'l Towing Ass'n*, 812 F.3d at 450; *Cole*, 314 F.3d at 735. Here, like in those cases, we have no reason to "doubt that safety is the justification for [the regulations]." *See Houston Prof'l Towing Ass'n*, 812 F.3d at 450.

We next look to "evidence that there was a 'nexus between the ordinance and public safety.'" *Id.* at 449 (alteration omitted) (quoting *VRC*, 460 F.3d at 614–15). The district court held there was. It held that the ordinance gave "the City the ability to hold charter bus operators who do not comply with the substantive safety provisions . . . accountable." Examples the district court mentioned included loading and unloading passengers in the street, alternative transportation for passengers when a bus broke down, and prohibitions on the sale of alcohol, controlled substances, and other criminal conduct. It also noted that the permitting requirements "imply the threat of permit revocation," making them "tools for policing misconduct."

When the relation between the regulation and safety is obvious and logical, the second prong of our analysis is satisfied. *See VRC*, 460 F.3d at 615; *see also California Tow Truck Ass'n*, 807 F.3d at 1020. This is true even if "municipalities are accomplishing some economic regulation, or more precisely consumer protection, while making findings about safety in the preambles of their ordinances." *See VRC*, 460 F.3d at 615.

No. 16-50115

UMA may have a point that the City is accomplishing economic goals, such as consumer protection, via some of the permitting regulations. We have recognized, though, that "safety and consumer protection are not mutually exclusive categories." *See id.* We agree with the district court that for most of the regulations, the relation is obvious and logical. For all of them, "the City's safety concerns are real enough that the court is convinced that they are both reasonably related and genuinely responsive to safety concerns." *See id.*

The district court did not err by finding a nexus between the permitting regulations and safety.

\* \* \*

The permitting regulations are not preempted by federal law. Thus, no injunction may issue. AFFIRMED.

14