FILED
United States Court of Appeals
Tenth Circuit

August 29, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

COLORADO MOTOR CARRIERS
ASSOCIATION,

      Plaintiff - Appellee/
      Cross-Appellant,

v.

TOWN OF VAIL; POLICE CHIEF
RYAN KENNEY,

      Defendants - Appellants/
      Cross-Appellees.

--------------------------------

COLORADO MUNICIPAL
LEAGUE; AMERICAN TRUCKING
ASSOCIATIONS, INC.,

      Amici Curiae.

Nos. 24-1017 & 24-1024

_____

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:23-CV-02752-CNS-STV)**
_____

David J. Goldfarb (Josh A. Marks and Abbey Derechin, with him on the briefs), Berg Hill Greenleaf Ruscitti, LLP, Boulder, Colorado, for Defendants-Appellants/Cross-Appellees.

James Anthony Eckhart, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Indianapolis, Indiana (Shannon McClellan Cohen, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Indianapolis, Indiana, and Adam Carl

Smedstad, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Seattle, Washington, with him on the briefs), for Plaintiff-Appellee/Cross-Appellant.

Rachel Bender, Colorado Municipal League, Denver, Colorado, filed an amicus curiae brief on behalf of Colorado Municipal League, in support of Defendants-Appellants/Cross-Appellees.

Richard Pianka, ATA Litigation Center, Washington D.C., filed an amicus curiae brief on behalf of American Trucking Associations, Inc., in support of Plaintiff-Appellee/Cross-Appellant.

_____

Before **BACHARACH**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This appeal involves a local ordinance restricting motor vehicles in a town's pedestrian areas. To resolve the appeal, we address two issues.

The first issue involves interpretation of federal statutes. These statutes ordinarily preempt local trucking regulations, but exceptions exist for motor vehicle safety. Do these exceptions allow a town to regulate trucking companies that frequently deliver goods in a pedestrian mall? We answer *yes*.

The second issue involves a preliminary injunction. A court can issue this kind of injunction only when a claimant proves irreparable injury. Can a district court discount the risk of irreparable injury when a claimant waits over a year before suing? We answer *yes*.

2

## Background

In 2022, the Town of Vail adopted an ordinance barring most vehicles from pedestrian malls. But exceptions existed. One was for *high-volume commercial carriers*, defined as carriers delivering commercial goods (not including food and beverages) to multiple recipients more than five days per week. Another exception allowed a contractor (approved by the Town) to deliver commercial goods in the pedestrian malls.

In 2023, the Town amended the ordinance by removing the exception for high-volume commercial carriers. The amendment spurred a legal challenge by the Colorado Motor Carriers Association, which represents numerous trucking companies.

The Association requested a preliminary injunction. The district court enjoined the amended ordinance, halting enforcement against high-volume commercial carriers. But the court declined to enjoin the original ordinance. The Town appealed the preliminary injunction, and the Association cross-appealed the refusal to enjoin the original ordinance.

## Discussion

### I.    Rulings on preliminary injunctions are reviewable for an abuse of discretion.

To obtain a preliminary injunction, the Association needed to satisfy four elements:

1.    It was likely to succeed on the merits.

3

2.      It would likely suffer irreparable injury without an injunction.

3.      The balance of equities favored the Association.

4.      An injunction would serve the public interest.

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). For the amended ordinance, the district court found satisfaction of the four elements. For the original ordinance, however, the court concluded that the Association hadn't shown irreparable injury.

We review rulings on preliminary injunctions under the abuse-of-discretion standard. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). This standard triggers

•      de novo review of a district court's legal conclusions and

•      review of factual findings for clear error.

*Id.* at 796–97. Sometimes a claimant argues that a district court found facts based on an improper legal standard. For these arguments, we engage in de novo review. *Osborn v. Durant Bank & Tr. Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994).

## II.    The district court erred in enjoining the amended ordinance.

In our view, the amended ordinance likely satisfies the requirements for the safety exceptions. So the district court erred in concluding that the Association was likely to succeed on the merits.

4

### A.    Preemption under the Federal Aviation Administration Authorization Act and the Airline Deregulation Act

In seeking a preliminary injunction, the Association alleged a likelihood of success based on preemption of the Town's ordinances under the Federal Aviation Administration Authorization Act and the Airline Deregulation Act. These Acts preempt most local regulations of routes and services of commercial carriers. 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A).

The Town does not deny that the original and amended ordinances would ordinarily be preempted. But exceptions exist for ordinances involving "safety regulatory authority . . . with respect to motor vehicles." 49 U.S.C. §§ 14501(c)(2)(A), 41713(b)(4)(B)(i); *see also City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442 (2002) (concluding that the Federal Aviation Administration Authorization Act's safety exception extends to local regulations).

The applicability of these exceptions drives the inquiry on likelihood of success. This inquiry involves statutory interpretation, which is a question of law triggering de novo review. *Rosette Inc. v. United States*, 277 F.3d 1222, 1226 (10th Cir. 2002).

To interpret the safety exceptions, we consider their statutory function, which is to preserve the states' "preexisting and traditional . . . police power over safety." *Ours Garage*, 536 U.S. at 439. Given the breadth of that police power, the safety exceptions are broad. *See Miller v.*

5

*C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1026 (9th Cir. 2020) ("In general, . . . courts have construed the safety exception broadly."). To trigger the safety exceptions, the ordinance needs only to

- regulate "with respect to motor vehicles" and

- be "genuinely responsive to safety concerns."

49 U.S.C. §§ 14501(c)(2)(A), 41713(b)(4)(B)(i) ("with respect to . . ."); *Ours Garage*, 536 U.S. at 442 ("genuinely responsive to . . .").

Despite the breadth of the exceptions, they require more than a tenuous connection to motor vehicles. For example, in *UPS v. Flores-Galarza*, the First Circuit considered Puerto Rico laws addressing evasion of excise taxes. 385 F.3d 9, 11 (1st Cir. 2004). Under the Puerto Rico laws, carriers bore duties involving licensing, bonding, and record-keeping. *Id.* at 13. The First Circuit concluded that these statutory duties were preempted because they didn't involve the safety of motor vehicles. *Id.* at 13–14.

Even when an ordinance involves the safety of motor vehicles, the Supreme Court has said that the exception in the Federal Aviation Administration Authorization Act applies only if the regulation is "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442 (2002).

The Association argues that this statement is no longer good law because the Supreme Court later rejected both (1) a presumption against

6

preemption and (2) a limitation on preemption to regulations that are economic in nature. We reject the Association's argument. The Supreme Court didn't expressly anchor its language (*genuinely responsive to safety concerns*) to either a presumption against preemption or a restrictive understanding of the scope of preemption. And even if the language had appeared "to rest on reasons rejected in some other line of decisions," we must "follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

The Association also argues that the Supreme Court didn't purport to create a standard when referring to a regulation's responsiveness to safety concerns. But four other circuits have said the opposite, relying on the Supreme Court's language in holding that the safety exceptions are triggered when a regulation is genuinely responsive to safety concerns. *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006); *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 494 (5th Cir. 2017); *Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 859 (9th Cir. 2012); *Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1252 (11th Cir. 2003). These holdings make sense because a regulation that is *genuinely responsive to safety concerns* must necessarily fall within a state's *safety regulatory authority*. 49 U.S.C. §§ 14501(c)(2)(A), 41713(b)(4)(B)(i).

7

The resulting issue is how to determine whether a local regulation is *genuinely responsive to safety concerns*. For its part, the district court applied the standard through a two-step process recognized in the Second, Fifth, and Ninth Circuits. *See Loyal Tire*, 445 F.3d at 145; *United Motorcoach*, 851 F.3d at 497; *Cal. Tow*, 693 F.3d at 860. In these circuits, the court asks two questions:

1.    Was the regulation motivated by legitimate safety concerns?

2.    Does the record show a logical nexus between the regulation and safety?

*See Loyal Tire*, 445 F.3d at 145; *United Motorcoach*, 851 F.3d at 497; *Cal. Tow*, 693 F.3d at 860. We follow that approach because it sensibly addresses the genuineness of a response to safety concerns.

To answer the first question under this approach, the court considers the text and legislative history, *Cal. Tow*, 693 F.3d at 859, along with litigation statements to the extent that they shed light on the "'surrounding circumstances,'" *Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 797 F.3d 733, 749 (9th Cir. 2015) (quoting *Cal. Tow*, 693 F.3d at 864).

To answer the second question, the court determines whether the record shows an "obvious and logical" nexus between the regulation and safety. *United Motorcoach Ass'n v. City of Austin*, 851 F.3d 489, 498 (5th Cir. 2017). For this determination, we recognize the legislature's domain of

8

policy-making; but we also consider whether the policy-making had strayed into improper areas.

When the nexus to safety is obvious, we generally defer to local regulators entrusted with the public interest in safety. *See id.* at 494 (rejecting a "searching standard" for the applicability of the safety exceptions). And we don't generally require extensive proof about the effectiveness of a regulation. *See VRC LLC v. City of Dallas*, 460 F.3d 607, 610, 615–16 (5th Cir. 2006) (upholding a regulation despite an absence of "documentary evidence, reports, or studies" of the safety issue); *Cal. Tow Truck Ass'n*, 797 F.3d at 750 (noting that "the safety exception is concerned with legislative *intent*, not legislative *effectiveness*" (emphasis in original)).

But we apply closer scrutiny when safety concerns appear to be pretextual. For example, a town might try to evade preemption through economic regulations masked as safety measures. *See VRC LLC*, 460 F.3d at 612 (stating that municipalities can't "hide economic regulation under the guise of safety regulation"). Or a town might discriminate against particular carriers by subjecting them to onerous safety regulations. *See Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 148 (2d Cir. 2006) (noting that the evidence for one safety justification was "thin and *post-hoc* in nature, especially when considered in light of the extensive

evidence of [a] discriminatory motivation"). In these circumstances, we require a stronger showing of a nexus between the regulation and safety.

B.    **The amended ordinance regulates *with respect to motor vehicles*.**

The Association argues that the amended ordinance doesn't regulate *with respect to motor vehicles* because applicability of the ordinance turns on ownership of the vehicle rather than its type. For this argument, the Association insists that

- an approved contractor can use any kind of vehicle and

- the Town is regulating who can use vehicles rather than the kind of vehicle that is permitted.

We reject this argument and conclude that the regulation applies with respect to motor vehicles.

To address the Association's argument, we focus on the meaning of the statutory term *with respect to*. This clause is synonymous with the term *relating to*. *See Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1030 (9th Cir. 2020) ("We have previously held that the phrase 'with respect to' in the safety exception is synonymous with 'relating to.'"). The term *relating to* is broad, meaning "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374,

10

383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)).[1] So a regulation applies *with respect to* motor vehicles if there's a connection to motor vehicles. *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 460 (7th Cir. 2023); *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1270–71 (11th Cir. 2023).

On its face, the amended ordinance focuses on motor vehicles. For example, § 7-11-3 is titled *Vehicular Traffic* and says that vehicular traffic in the mall areas is generally prohibited. Appellant's App'x vol. 2, at 308. And § 7-11-4 creates exceptions for certain types of "vehicular traffic." *Id.* at 309. Given the language in these sections, the ordinance regulates with respect to motor vehicles. So the amended ordinance likely satisfies the first requirement for the safety exceptions.

## C.     The amended ordinance is *genuinely responsive to safety concerns*.

The Association also argues that irrespective of the Town's intent, the amended ordinance wasn't *genuinely responsive to safety concerns*. The district court agreed, concluding that the regulation wasn't sufficiently connected to safety. But the district court applied an overly demanding standard for the second inquiry.

---

[1]     The Association elsewhere relies on the breadth of the term *related to*. Appellee's First Br. at 42–43.

11

1.    **The amended ordinance was motivated by *legitimate safety concerns*.**

At the first inquiry, we focus on the text and legislative history of the amended ordinance. *See* p. 8, above.

The ordinances say that the Town

- intended to address concerns including "the safety of pedestrian traffic,"

- found that "a coordinated delivery system [would] address such concerns," and

- concluded that the earlier exemption for high-volume commercial carriers had undermined the purpose of the plan.

Appellant's App'x vol. 2, at 308, 312–13. These statements of intent are pertinent, but are not dispositive given their brevity. *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 146 (2d Cir. 2006).

The legislative history includes testimony by Police Chief Ryan Kenney about his out-of-court statements. Chief Kenney testified in two respects about how the Town had focused on safety.

First, he testified that the town manager had

- considered changes in the delivery of goods and

- directed the police department to lead the project because the primary concern involved safety.

This testimony indicates that safety was a genuine concern behind the regulation.

Second, Chief Kenney testified about a report showing that a pilot program had promoted safety by restricting large trucks in the pedestrian malls. This report suggests that the Town was trying to enhance safety.

The Town also presented evidence of Chief Kenney's out-of-court statements focusing on safety. For example, a UPS representative testified that during a walking tour of the pedestrian mall, Chief Kenney had said that the Town's main concern was safety. And in an email to a FedEx employee, Chief Kenney said that the Town's goal had been "to provide a safe pedestrian environment . . . ." Appellant's App'x vol. 2, at 336.[2]

The Association downplays this evidence, pointing out that (1) no one had mentioned safety in some of the meetings and (2) town leaders had instead referred repeatedly to improvements in the "guest experience."

Chief Kenney explained that later meetings had sometimes omitted mention of safety concerns because they were so well understood. For example, he testified that town leaders had worked for decades on "pedestrian safety" and removal of vehicles from the pedestrian malls. Appellant's App'x vol. 3, at 649. Given that history, Chief Kenney testified

---

[2] The email came a few weeks after adoption of the amended ordinance. But the email is still pertinent to the Town's safety motivations. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 535 (1982) (stating that the Supreme Court should not ignore "postenactment developments" bearing on the scope and purpose of a statute).

13

that the community had shifted its focus to operations because town leaders had already recognized the need to enhance safety.

Chief Kenney also acknowledged that he hadn't mentioned safety in a memo discussing removal of the exception for high-volume commercial carriers. He explained, however, that reference to safety wasn't necessary because town leaders had already recognized the safety risks from the presence of high-volume commercial carriers.

The Association criticizes this explanation, pointing to Chief Kenney's numerous references to the "guest experience" in the pedestrian malls. But he testified that as the police chief, he was using the term *guest experience* to refer to the pedestrian's "being" and "feeling safe." *Id.* at 641.

In sum, we agree with the district court that the Town had a legitimate concern with "safety relating to motor vehicles." Appellant's App'x vol. 1, at 282. The Town surely had other concerns, such as the appearance of the pedestrian malls. But the presence of additional goals doesn't erase the concern over safety. *See Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 859–60 (9th Cir. 2012) (stating that it's not fatal if safety is coupled with another reason for a regulation). So the amended ordinance likely satisfies the first inquiry.

**2.      The amended ordinance bears a logical nexus to safety.**

The second inquiry is whether a logical nexus exists between safety and the amended ordinance.[3] The district court correctly identified this inquiry, but misapplied it.

**a.      The district court misapplied the inquiry.**

The district court purported to consider only the logic behind the Town's effort to enhance safety through the amended ordinance. But in examining the logic behind the Town's effort, the district court shortchanged the primacy of local policymaking, substituting the court's own judgment about better ways to enhance safety.[4]

In questioning the nexus, the district court noted that the amended ordinance

---

[3]      We need not determine whether this inquiry involves a factual question, a legal question, or a mixed question of law and fact. Because we conclude that the district court misapplied the legal standard, we engage in de novo review. *See Osborn v. Durant Bank & Tr. Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994) ("[W]hen a lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review.").

[4]      The Association also argues that the amended ordinance constitutes improper economic regulation by giving the Town-approved contractor a monopoly within the pedestrian malls. But the Town's evidence showed that the choice of a single contractor was not an end in itself. Rather, that choice constituted a means to achieve a safety objective. *See* Appellant's App'x vol. 2, at 336, 480; Appellant's App'x vol. 3, at 531–32, 644–47, 649. The Association thus hasn't shown that safety was a likely pretext for economic regulation, and the failure to make that showing triggers deference to the Town's policy choice. *See* pp. 9–10, above.

- hadn't created a blanket prohibition on large box trucks inside the pedestrian malls and

- had retained the exceptions for other large vehicles like garbage trucks, armored money trucks, and public buses.

But before the amended ordinance, high-volume commercial carriers had used 2–6 large box trucks every day in the pedestrian malls. Given that volume and consistency, the Town could reasonably conclude that

- the safety benefits of restricting access for high-volume commercial carriers would outweigh the costs, given the feasibility of an alternative delivery system, and

- the costs would be too severe if the Town were to bar all big vehicles from the pedestrian malls.

Those conclusions wouldn't sever the connection between the amended ordinance and safety; to the contrary, these conclusions would simply reflect regulatory discretion. In connection with that discretion, Chief Kenney testified that town leaders had been exploring ways to remove garbage trucks from the pedestrian malls. Given this testimony, the connection to safety isn't lost just because a more expansive restriction might have been more effective. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993) (stating that "the legislature must be allowed leeway to approach a perceived problem incrementally"); *see also Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 807 F.3d 1008, 1024–25 (9th Cir. 2015) (rejecting a challenge involving a logical nexus to safety because the

safety exception applies even if another method might have been more appropriate).

The district court also noted the lack of evidence of pedestrian injuries caused by high-volume commercial carriers operating in the pedestrian malls. But even when this evidence is absent, we defer to regulators based on their experience. For example, the Fifth Circuit has upheld regulations for signage on towing companies based in part on testimony by a city official that (1) "there was a real problem with confrontation between citizens and tow truck drivers" and (2) "the signs had been helpful" in addressing the problem. *VRC LLC v. City of Dallas*, 460 F.3d 607, 615 (5th Cir. 2006). The Fifth Circuit didn't require "documentary evidence, reports, or studies of the phenomenon;" the official's testimony "from his experience" was sufficient. *Id.* at 610, 615.

The Fifth Circuit's approach is sensible: We're not policymakers, but the Town's leaders are. Those leaders presumably enjoy expertise when deciding how to address safety concerns. Recognition of that expertise leaves us little room to second-guess the leadership's policy choices based on our policy preferences. *See Chhetri v. United States*, 823 F.3d 577, 588 (11th Cir. 2016) ("[I]t is beyond dispute that 'government regulators' safety determinations' for motor carriers 'involve[] consideration of public policy.'" (quoting *Pornomo v. United States*, 814 F.3d 681, 688 (4th Cir. 2016))).

17

**b.    A logical nexus exists to safety.**

Recognizing that expertise, we conclude that the amended ordinance likely bears a logical nexus to safety.

Before the amended ordinance, high-volume commercial carriers had frequently used big box trucks in the pedestrian malls. Addressing the use of the big box trucks, town leaders testified that

- the pedestrian malls hadn't been designed for vehicle traffic and lacked typical traffic controls,

- delivery trucks had encountered crowds and other obstacles when navigating the pedestrian malls,

- pedestrians had often felt little need to pay close attention to vehicles because the areas had been set aside for pedestrians,

- a delivery truck had "sideswiped" a pedestrian, and

- there had been other "close calls."

Appellant's App'x vol. 3, at 609, 660, 662. Against this factual background, Chief Kenney testified that he had assessed "a very high potential of . . . a serious accident . . . ." *Id.* at 662.

Prompted in part by that safety concern, the Town eliminated the exception for high-volume commercial carriers. Through this change, the carriers—like other non-exempt groups—would need to make deliveries to

the pedestrian malls by foot or through a Town-approved contractor.[5] The Town based this preference on the contractor's use of motorized carts that were smaller than a traditional box truck, as shown in this photograph of the two vehicles:



Appellant's App'x vol. 2, at 335. And Chief Kenney testified that the carts had enhanced safety because their drivers were "eye to eye with pedestrians" and had "a very good view for navigating a pedestrian mall." Appellant's App'x vol. 3, at 666–67.

The safety advantages are likely considered logical when the pedestrian malls are compared to other pedestrian areas, such as an airport

---

[5]    The Association suggests that the U.S. Constitution didn't allow the Town to award a local monopoly to a single contractor. But our issue involves the scope of the safety exceptions, not the constitutionality of the exception for deliveries by an approved contractor.

terminal. Like a pedestrian mall, an airport terminal lacks designated lanes of travel and bears heavy foot traffic moving in different directions. Pedestrians may not expect vehicles, but they're sometimes present. In an airport terminal, a small motorized cart wouldn't ordinarily appear out of place or pose a significant safety risk; but a box truck might. The same might be true of a box truck in a pedestrian mall.

The Association argues that the amended ordinance doesn't actually address this safety concern because the Town-approved contractor could use large vehicles in the pedestrian malls. But this argument disregards Chief Kenney's testimony that the approved contractor agreed to use only its small motorized carts.

According to Chief Kenney's testimony, this restriction appeared in the contract between the Town and the contractor; and the Association presented no contrary evidence. Of course, the contractor could conceivably breach that contract by shifting from small motorized carts to box trucks. But such a breach would jeopardize the contractor's exemption from the ordinance. And without that exemption, the contractor couldn't even drive its small motorized carts inside the pedestrian malls.

By obtaining a contractual commitment to use small motorized carts and banning box trucks, the Town tried not only to reduce dangers to pedestrians but also to ease the movement of emergency vehicles. In fact, Chief Kenney and Fire Chief Mark Novak testified that delivery trucks had

impeded emergency vehicles, delaying responses. Granted, Fire Chief Novak testified that he didn't know of any such incidents since the Town had imposed restrictions on delivery trucks. But given the frequent presence of box trucks used by high-volume commercial carriers, removing them from the pedestrian malls would logically reduce the obstructions to emergency vehicles.

In sum, the amended ordinance likely bears a logical nexus to the Town's safety concerns.

* * *

The amended ordinance likely satisfies both requirements for coverage under the safety exceptions. The district court thus erred in concluding that the Association had shown a likelihood of success on the merits. As a result of that error, the court abused its discretion in enjoining the amended ordinance.

III. **The district court didn't err in declining to enjoin the original ordinance.**

The district court declined to enjoin the original ordinance, concluding that the Association hadn't shown irreparable injury. We review this ruling for an abuse of discretion. *See* Discussion–Part I, above.

The district court didn't abuse its discretion, so we affirm the denial of a preliminary injunction against enforcement of the original ordinance.

A.    **Courts disfavor preliminary injunctions changing the status quo.**

The purpose of a preliminary injunction is to preserve the status quo as it existed before the dispute arose. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). In this case, the dispute arose when the Association sued after more than a year of experience under the original ordinance. So the status quo was the period between the enactment of the original ordinance and the amended ordinance.

The Association argues that the district court shouldn't have concluded that it lacked authority to issue an injunction that would disrupt the status quo. But the court didn't say that it lacked authority. The court simply said that the requested relief was inconsistent with the "limited purpose" of a preliminary injunction. *Id.* at 1258.

We generally disfavor preliminary injunctions that disturb the status quo. *Id.* at 1258–59. So the Association needed to meet a "heightened standard" by making a "stronger showing" on the elements of a preliminary injunction. *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016); *see* Discussion–Part I, above (identifying the elements).

B.    **The court could reasonably decline to find irreparable injury based on the Association's delay.**

After identifying the status quo, the district court noted that the original ordinance had been in place for more than a year before the

Association sued. Based on that delay, the court concluded that the Association hadn't shown irreparable injury.

The Association argues that the district court erred by treating the delay as dispositive. The delay doesn't automatically bar a preliminary injunction. *See Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (noting that "delay is only one factor to be considered among others . . . and [that] there is no categorical rule that delay bars the issuance of an injunction"). But a delay can justify the denial of a preliminary injunction. *Ng v. Bd. of Regents*, 64 F.4th 992, 997–98 (8th Cir. 2023). The key question is "whether the delay was reasonable" or instead "a decision by the party to 'sit on its rights.'" *Fish*, 840 F.3d at 753 (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1212 (10th Cir. 2009)). An unreasonable delay "undercuts a finding of irreparable harm." *Id.* So the district court didn't abuse its discretion in deciding that the delay had undercut the Association's claim of irreparable injury.

The Association presents only one justification for the delay, alleging that the Town

- initially treated one of the Association's members (FedEx Freight) as exempt from the original ordinance and

- started enforcing the original ordinance against that member after the court had temporarily halted enforcement of the amended ordinance.

23

This alleged change in enforcement might have justified a delay by FedEx Freight. But the Association sought relief for all of its members, not just FedEx Freight. And the Association didn't allege similar changes for any other members. So the district court didn't abuse its discretion by concluding that the delay had "belie[d] [the Association's] contention of irreparable harm." Appellant's App'x vol. 1, at 288.[6]

* * *

Because the district court didn't abuse its discretion in concluding that the Association hadn't shown a likelihood of irreparable injury, the court didn't err in refusing to enjoin the original ordinance.

---

[6] The Association also argues that when express preemption is involved, a finding of likelihood of success triggers a presumption that the movant has satisfied the three other elements. For this argument, the Association quotes part of a sentence from the Fifth Circuit's opinion in *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990). We reject this argument for two reasons.

First, the argument stems from a misreading of *Trans World*. The quoted sentence reads in full: "*Under the facts of this case* we believe the finding with respect to likelihood of success carries with it a determination that the other three requirements have been satisfied." *Id.* (emphasis added). Given the entirety of the sentence, we don't read *Trans World* as recognizing a presumption of irreparable injury whenever a movant shows likely success on the merits.

Second, even if a presumption applied, the district court could conclude that the Town had rebutted the presumption based on the Association's delay.

24

## Conclusion

For the amended ordinance, we reverse the district court's decision and remand with instructions to dissolve the preliminary injunction. But we affirm the district court's ruling as to the original ordinance.

24-1017, 24-1024, *Colorado Motor Carriers Association v. Town of Vail, et al.*
**PHILLIPS**, J., dissenting.

I agree with the majority's two-step framework for analyzing whether a local motor-vehicle regulation is "genuinely responsive to safety concerns" and thus excepted from federal preemption. The first step asks whether safety concerns motivated the regulation. The second step asks whether the regulation has a logical nexus to those safety concerns. The district court analyzed both steps.

At the first step, the district court found that the Amended Ordinance was, at least in part, motivated by legitimate safety concerns. In making that finding, the district court suggested that the Town's "chief concern" for the Amended Ordinance was aesthetics, not safety. *Colorado Motor Carriers Ass'n v. Town of Vail*, No. 1:23-CV-02752-CNS-STV, 2023 WL 8702074, at *9 (D. Colo. Dec. 15, 2023) ("*CMCA*"). But the district court nonetheless found a safety motivation because Police Chief Ryan Kenney testified that the Town had passed the Amended Ordinance to protect against hazards caused by large delivery vehicles in the Pedestrian Mall Areas. *Id.* Like the majority, I agree with the district court's finding that the Town asserted a legitimate safety motivation for the Amended Ordinance.

At the second step—whether there is a logical nexus between the regulation and safety—the district court concluded that the Town had "not shown a clear nexus between the Amended Ordinance's exclusion of HVCCs

from the Pedestrian Mall Areas and the need to ensure the safety of pedestrians in those areas[.]" *Id.* at *10. Thus, the district court determined that the Amended Ordinance was not "genuinely responsive to safety concerns." *Id.* (citation modified). Unlike the majority, I agree with the district court at this second step. And in my view, the majority largely ignores the district court's analysis. So here's the district court's logical-nexus reasoning:

> [T]he Amended Ordinance does not purport to regulate the passage of motor vehicles through the Pedestrian Mall Areas based on the relative risks they pose to pedestrians, but instead based on the owner of the vehicle or the purpose for which the vehicle is used. As CMCA has aptly put it, "the motor vehicles owned by CMCA's Members cannot access the Pedestrian Mall Areas when used by CMCA's Members to make deliveries. But those same vehicles could be used to enter or exit a parking structure to access a business or residence. Or they could be used by property owners and their guests to actively load or unload. They could be used by 106 West Logistics. And they could be used by anyone else so long as Vail authorized it via a valid Town-issued permit." Tellingly, Chief Kenney conceded that if two of the exact same type of vehicle attempted to enter the Pedestrian Mall Areas to deliver goods—one operated by 106 West Logistics and the other operated by an HVCC like FedEx or UPS—only the vehicle operated by the Town's exclusive contractor, 106 West Logistics, would be allowed inside.

*Id.* (citation modified). In short, the district court first recognized that the Amended Ordinance allows 106 West Logistics to drive the same sort of large delivery vehicles into the Pedestrian Mall Areas as before the Amended Ordinance. Indeed, the Amended Ordinance restricts neither delivery-vehicle size nor delivery-vehicle frequency. Instead, it regulates "based on the owner of the vehicle[.]" *Id.* The district court continued:

2

> No one on behalf of the Town has endeavored to explain why pedestrians in the Pedestrian Mall Areas are safer around motor vehicles operated by 106 West Logistics than they are around identical vehicles operated by other commercial carriers. This question is especially pressing in view of the facts that two of the largest HVCCs, FedEx and UPS, had *never* been cited for traffic violations in the Pedestrian Mall Areas, *never* injured a pedestrian in the Pedestrian Mall Areas, and had trained its delivery drivers extensively in safe motor vehicle operation. There was also no testimony that drivers for 106 West Logistics had a better or even comparable safety record than any of the major HVCCs with respect to pedestrians. Furthermore, no one on behalf of the Town has explained why it is unacceptably risky for HVCC trucks to operate in the Pedestrian Mall Areas, while other motor vehicles of similar types and sizes—such as public transportation buses, armored money vehicles, and waste and recycling collection trucks—do not pose such risks and remain free to drive through those areas. In short, the Town has provided no satisfactory explanation for why the Amended Ordinance—which removes HVCC vehicles from the Pedestrian Mall Areas but abides the presence of other similar vehicles—is supposed to make pedestrians in those areas any safer.

*Id.* (citation modified).

The majority claims that the district court misapplied the logical-nexus inquiry by "shortchang[ing] the primacy of local policymaking" and "substituting the court's own judgment about better ways to enhance safety." Maj. Op. at 15. Thus, the majority faults the district court for not blanketly deferring to the Town's safety motivations. But I see nothing in the majority opinion that disputes the district court's key nexus point—that the Amended Ordinance allows 106 West Logistics to drive the same large delivery vehicles into the Pedestrian Mall Areas as others did before the Amended Ordinance. Likewise, the majority does not dispute that any Town-approved contractor

3

could drive *more* large delivery vehicles into the Pedestrian Mall Areas than before the Amended Ordinance. Because the majority does not dispute these points, I understand the majority as tacitly ruling that when an otherwise-preempted regulation has an identifiable safety motivation, we must defer to local policymaking authority even if the regulation by its terms and effect in fact lacks a logical nexus to safety.

In contrast, I agree with the district court that the Amended Ordinance lacks a logical nexus to the Town's safety motivation (curing hazards posed by large delivery vehicles in the Pedestrian Mall Areas), because the Amended Ordinance permits as many of the "exact same" large delivery vehicles to enter the Pedestrian Mall Areas as before the regulation.[1] *CMCA*, 2023 WL 8702074, at *10. Thus, I agree with the district court's preliminary conclusion that the Amended Ordinance falls outside the safety exceptions to federal preemption. So I respectfully dissent.

---

[1] I recognize that Police Chief Kenney testified that the Town contractually requires 106 West Logistics to use small delivery vehicles in the Pedestrian Mall Areas. Assuming such a contract exists, the Town could change it tomorrow. Or the Town could create new contracts with other companies. For example, the Town could allow FedEx to drive large delivery vehicles into the Pedestrian Mall Areas, but not UPS. And anyway, the Amended Ordinance sets the bounds in the Town, not a given contract. *Cf. United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").